[No. 14543. Department Two. November 20, 1918.]

N. E. NELSON, *Respondent,* v. INDUSTRIAL INSURANCE DEPARTMENT, *Appellant.*[1]

MASTER AND SERVANT (121-2)—INJURIES TO SERVANT—ACTIONS—REMEDIES UNDER WORKMEN'S COMPENSATION ACT — EVIDENCE — SUFFICIENCY. A finding of total partial disability in the loss of one eye as the result of an injury is sustained by evidence that the claimant's eyesight was good before the accident and began to fail shortly after, coupled with the opinion of reputable oculists that the condition may have resulted from the accident.

SAME (121-2)—COSTS—EXPERT WITNESS FEES. Costs and witness fees being purely statutory, the court has no discretion to allow extraordinary fees to expert witnesses under the workmen's compensation act, Rem. Code, § 6604-20, which authorizes the court to allow a reasonable attorney's fee and the "fees of medical and other witnesses," out of the administration fund.

Appeal from a judgment of the superior court for Clarke county, Back, J., entered June 12, 1917, upon findings in favor of the plaintiff, allowing a claim for compensation, upon appeal from an order of the industrial insurance commission, tried to the court. Modified.

*The Attorney General* and *Howard Waterman, Assistant,* for appellant.

*Henry Crass,* for respondent.

CHADWICK, J.—This case comes to us on appeal from a judgment of the superior court overruling an order of the industrial insurance department denying respondent an allowance for a permanent partial disability.

Respondent was injured in an accident on a logging

[1]Reported in 176 Pac. 15.

railroad.  He claims the loss of the sight of one eye. The court made findings as follows:

"That, prior to the accident, plaintiff's eyesight was good and he was not afflicted with optic atrophy.

"That, at the time of the injury, plaintiff complained of severe pain in his head over the left eye, which pains continued for some time, and to a certain degree up to the time of the trial.

"That shortly after the injury, the sight of the left eye began to fail and decrease rapidly, and at the time of the trial plaintiff was practically blind in the left eye.

"That, shortly before the accident, plaintiff could use one eye as well as the other, and there was no difference in the sight of either.

"That, as a result of the injury, plaintiff has sustained the practical total loss of vision in the left eye."

The physicians called in behalf of the department testify positively that the loss of the sight of respondent's eye could not have resulted from the injury received in the accident; that respondent is suffering from a primary optic atrophy; that primary atrophy is not due to inflammatory processes, nor is it the result of an injury; that, if there has been an atrophy of the optic nerve due to such causes, it is called secondary atrophy; that it is likely that respondent, being afflicted with true or primary optic atrophy, was not aware of his condition, which must have existed for some time before the accident, although not discovered until after he had been injured.

On the other hand, professional men testifying on behalf of respondent advance the opinion that there may have been some injury of the optic nerve; that it is almost impossible to make a positive diagnosis

in a case like this; that no one can say definitely whether an atrophy of the optic nerve is primary or secondary without considering the history of the case, and that there is no specific rule to positively determine what has caused the condition. One of the doctors suggests that learned discourse about primary and secondary atrophy is "dictionary definition, pure and simple," and that the term primary atrophy is often used for convenience to cover ignorance of the true causes. The doctors, as is sometimes the case, have disagreed. Their opinions cannot be reconciled. The testimony of the respondent is that he was a carpenter by trade; that, up to the time of the accident, he used either eye as convenience dictated, and that there had been no trouble with, or diminution of, his vision. A neighbor testified that, about a year before the accident, he was with respondent when he was shooting hogs, and that he could shoot from one shoulder as well as the other and that he never complained about his eyesight.

One of the first inquiries made by oculists in cases of atrophy of the optic nerve is whether the patient has ever been afflicted with lues, or any germ-carrying disease. There is no evidence that respondent was ever so afflicted. He denies that he was ever the victim of any such condition. These physical facts, coupled with the opinion of reputable oculists that the condition may have resulted from the accident, are enough to sustain the judgment of the court below.

The trial judge allowed a fee of $45 to one of the medical witnesses, who came from Portland, Oregon, to attend the trial. It is the contention of respondent that this allowance is proper under Rem. Code, § 6604-

20, which provides that the court may allow an attorney's fee,

"and the fees of medical and other witnesses and the costs shall be payable out of the administration fund, if the accident is affected by the litigation."

There is no provision of the law that will warrant the payment of extraordinary fees to expert witnesses as such. It was formerly provided, § 25 of the original act of 1911, Laws of 1911, p. 371, that,

"Upon appeal of any workman from any decision of the department affecting the extent of his injuries or the progress of the same, the court may appoint not to exceed three physicians to examine the physical condition of the appellant, who shall make report to the court thereon, and they may be interrogated before the court by or on behalf of the appellant in relation to the same. The fee of each shall be fixed by the court, but should not exceed ten dollars per day each."

This section was expressly repealed by § 10, ch. 188, Laws of 1915, p. 691, at which session of the legislature it was provided "that fees of medical and other witnesses and the costs shall be payable out of the administration fund."

We think it is hardly within any rule of statutory construction to say that it was the intention of the legislature to leave the fixing of witness fees to the discretion of the court.

"At common law costs were not recoverable *eo nomine* . . . costs can therefore be imposed and recovered only in cases where there is statutory authority therefor." 15 C. J. 21.

"It is the settled law of this state that 'costs are purely statutory, and can only be awarded when the statute gives them'." *Eggerth v. Spokane,* 91 Wash. 221, 157 Pac. 859.

Being dependent upon the statute, costs and witness fees are never to be allowed in the discretion of the trial judge, in the absence of a positive or permissive statute. *In re Queen's Estate,* 82 N. J. Eq. 588, 89 Atl. 860; *Struthers v. Christal,* 3 Daly's (N. Y.) 327; *Wallace v. Sheldon,* 56 Neb. 55, 76 N. W. 418.
So it is held that,

"Sums paid for compensation of expert witnesses, beyond ordinary fees authorized by statute for witnesses generally, are not taxable as costs." 15 C. J. 131; 5 Standard Ency. Proc. 951.

It will be observed that the only discretion given to the court in the allowance of costs on appeal from an order of the department is that the trial judge may fix a reasonable attorney's fee and *"such* [reasonable] fee, *and the fees* of medical and other witnesses . . . shall be payable etc.," plainly indicating that it was the intent of the legislature to associate medical witnesses with "other witnesses" and not with the attorney, whose service is independent of the witnesses and for which no fee is provided by law. We have heretofore refused to extend the terms of this statute by construction. *O'Brien v. Industrial Insurance Department,* 100 Wash. 674, 171 Pac. 1018.

It follows that the judgment of the lower court should be modified to this extent. In all other respects it is affirmed.

MAIN, C. J., HOLCOMB, MOUNT, and MACKINTOSH, JJ., concur.